Thank you, your honor. Good morning and may it please the court. There's no dispute in this case that the traffic stop was extended after the officer printed the warning citation at 11.59. The only issue for this court to resolve is whether he had reasonable suspicion to do that. The district court found reasonable suspicion based on just two things, that the driver was are corroborated or supported by the officer's own video footage. It makes sense that the government is opposing our pending motion to supplement the appendix with the video from the dash cam. The video of the officer's body cam was supplemented in appendix already. Both are part of the record. But if this court watches the first minute of that dash cam video, I think it will that the driver was not slow to stop. And in fact, she pulled over at the first available opportunity to her. In alternatively, if there's nothing in the videos that's not in the record, because I know I've seen several videos. That's right. Both videos are part of the record. We were simply attempting to supplement the appendix. So the court can view it either way if it has it. Alternatively, it could judicially notice a map of the area, which it could do and has done before. And the, let's see, the address for the First United Bank is 195100's Way, Morgantown, West Virginia, 26505. Either way, consulting either of those sources, what this court will plainly see is that the driver of the Jeep, Ms. Phillips, was at the moment when Officer Helms activated his lights to pull her over, she was already past any reasonable opportunity to take the turn he said it was suspicious she did not take. It will see that at 30 seconds into that dash cam video, the Jeep and the dotted line to enter into the turning lane for the Hunter's Way parking lot, as he calls it, which is actually Sterling for her to actually take that turn at the moment he activated his lights, she would have had to cross a solid line to do it. She would have had to violate a traffic law. This court will also see if it consults a map of the area that the driver took the very next street to turn over. She did it within 17 seconds, and it was the only next turn available to her. And it will also see that there is no shoulder on the section of road between those two streets. And for that reason, the evidence is important because it explains and confirms why the district court's reliance on the distance, the 50 to 70 yards, or the 17 seconds is, it's nonsensical because it was the first opportunity. Secondly, in terms of the nervousness, I think if this court watches the video, it can also see that the driver is not excessively nervous. Um, this court has before refused to accept factual findings that are contradicted by video footage, and it can do so again here too, and it should. We have cited on page three of our motion to supplement the appendix United States versus Kehoe, and also Scott v. Harris, um, in which the Supreme Court found that it was erroneous for the district court to make findings that were versus McGee, 736F3263 at 270, which is a 2013 case. That says that even credibility findings by the district court are not insulated from review if the documents or objective evidence contradicts that testimony. And also, of course, it was relevant in Bowman that although the officer cited nervousness, Bowman appeared and sounded calm in the video. But I also want to say that. Can I just take you back to what you just said earlier about how long it took for your client to actually pull over? The district court in her order indicated that the officer's suspicions and concerns were heightened for officer safety. That was a concern, that pulling over into a darkly lit part of the highway, that she was slow to pull over, pass at least one or two well lit streets and parking lots in favor of a dimly lit section of the route. So what part of that do you take offense to? Two offenses I take to that. The first is that another reason why the dash cam footage is so important is because if this court watches again the first 30 seconds, it will see officer Helms pass by several bigger and more well lit parking lots without activating his lights or making any attempt to do it. He does not turn on his lights until 30 seconds in where he has allowed the vehicle to drive into a darker area of that stretch. That cannot be attributed to the driver. That can only be attributed to the officer. And again, it's a reason why I think the dash cam footage is important to watch at least the first minute of it. And the other thing that the district court judge says is that it may not seem like 17 seconds is a long time, but it's a math which is always a precarious thing for lawyers and judges to do and indicated that the car might have traveled at least 100 yards and while that may not seem like an unreasonable amount of time, we shouldn't Monday morning quarterback the officer. And it's true. I mean, in most cases, particularly when we don't have the benefit of video evidence, we defer to the officers, to the district court's findings of facts. So what is it about that, that problematic in your view? Because again, I think if the court just looks at the first minute of the dash cam video and, and, or consults a Google map and clicks over to the satellite tab, you can see very clearly that distance or time notwithstanding, there is no other opportunity before she pulls over for her to do. So there just isn't one. She has no shoulder. There is no street between the two. It could have been a mile and that would still be true. But I would also point out that the actual distances, according to Google maps, it's 0.1 mile. It's very short. It is the very next block. I would also point out that in terms of officer safety, for all the reasons I've just explained, those circumstances were not the necessary result of the officer's decisions and actions that evening. And she didn't get to decide where, when he would turn his blue light on. Correct. She could not. And it was clear, you see when you have to guess on that, right? I saw both of them. She was driving. She's next to where he said she'd turn. Like I said, she had made a sharp right to try to get over it. I guess would have been another problem to say, Oh, you see, she made that sharp turn. I believe she would have had to have crossed the solid line, in which case she would have committed a second traffic infraction. Nonetheless, I just want to say that not all of this aside, those two factors alone, even if they were true, they aren't. But even if they are, are not enough to create reasonable suspicion. And I think it's notable that neither the district court nor the government has cited a presidential decision of this court finding that being slow to stop and nervous is reasonable suspicion absent anything else. And of course it isn't. I mean, this court has said over and over and over again, that nervousness is not a good indicator because just about everyone is some level of nervous when pulled over or interacting with the police. In Bowman at 214, at Massenburg at 490. I mean, on and on and on. Also, even that aside, the behavior of the driver in this case was not really nervous. I think you can see from the video, but even if it was somewhat nervous, giving the absolute most benefit of the doubt, it's not extreme or unusually nervous as this court has required previously. For example, it was not accompanied by any heavy breathing or heavy sweating or pulsing arteries or shaking hands like in May. No furtive actions as well. Nothing. Not avoiding a police officer's eye contact. None of that. I didn't see. I looked at it. It's a very innocuous video. And you know, this court has also said that sometimes, you know, a handshake is just a handshake. Sometimes things have ordinary explanations. And so for the district court to, and I think, you know, my reading of the district court's order is that the district court very clearly acknowledges that we cannot see any of these things the officer claims occurred. They're just not on the video. We can't see them, but the officer said that, you know, we can't see any handshaking, but the officer said there was, so that must be true. And I think that's frankly dangerous because it gives officers the green light to simply know that they say certain magic words that we, well, we can't, you know, I get, they said it, so it must be true, even though our eyes are telling us something else. And I think for that reason, you know, Judge Wynn explained in Drakeford that we really have to have rational limits to experience as a placeholder for objective facts, that even with his training and experience, Officer Helms fell short here of his duty to explain why what he observed didn't have some equally plausible, innocent explanation. Again, as in Drakeford, sometimes a handshake is just a handshake. Sometimes talkativeness is simply a personality. Sometimes nervousness is just because you've been pulled over the day that you got your valid learner's permit or license again, and you're driving your daughter's car, and maybe that wasn't how you saw your evening going. I mean, what is it in terms of nervousness? I mean, it seems that looking at it, I don't see how this would exclude 99% of the people who were stopped by a police officer. It would not exclude a substantial portion of innocent travelers. I hate to say that, to say that I haven't experienced it, I think nervousness does come when you're stopped. I would agree. So, and also notably, I mean, the District Court at the time of benefit of Drakeford, which was issued afterward, so that may have played a part in it. But nonetheless, Drakeford, of course, is correct. This court's, all of this court's prior precedent that we've pointed out is correct. And there just simply is not reasonable suspicion in this case. I am happy to answer any further questions the court may have. Otherwise, I'll reserve the remainder of my time for rebuttal. Thank you. Ms. Wesley. May it please the court. Officer Helms testified that he regularly parks his vehicle in the Smokers Friendly on Route 7, which is in Morgantown, West Virginia, because it's a well-traveled drug corridor between Monongahela County and Preston County. He further testified that from that vantage point, he can see traffic violations as they pass. He further testified that in 2018, he conducted approximately 280 to 300 traffic stops. A good bit of them occurred in that area. That makes him familiar with what people do when he executes a traffic stop on that Route 7 area. And his testimony was, is that, that Hunter's Way, which is a big parking area, which is well-lit, is where people pull over. Now, he also testified. Was there a sign that people know if I'm, please come, make sure you pull over here? Well, there's not a sign, but what makes sense is if you are a motorist, is that you want to there's a well-lit area where people can see you and you can see others. This car drove beyond the well-lit area, did not pull off the road, parked on the side of the road, where it is dark, where it is dangerous as other cars are pulling off, and where Officer Helms- Did the officer say at what point he routinely activates or he always activates at the same point on the road? What he, his testimony was- Did he say that he always activates his blue light at the same point on the road? His testimony was- Did he say yes or no? It's not a yes or no answer, Your Honor. Well, I ask you, did he testify that he activates his blue light at the same point every time in those 200 stops? He did not testify to that. No. So the answer is no. You can explain, but please just answer the question. No, go ahead. His testimony was that there was another car between the vehicle that he was following and himself. And once that car moved out of the way, then he activated his lights. So it made a difference here. That's the point. It made a difference, didn't it? But when you look at the video, you can see the turning lane, well, the turning lane where that vehicle still could have pulled in. And he also testified, you could have seen it. Yes, it was physically possible. Do you mean could have? Yes. Okay. But counsel didn't conceded that. Yes, she could have pulled into a solid lane. Well, his testimony in addition to that was, is he had observed vehicles to do just that, because that was his testimony, because that is where- And so the motorist is put to the test that you have to have the same skills, uh, reaction time and everybody else. And that if not, then that's a big, that's probable cause to stop. You know, most people were able to maneuver that and make that stop there, but you didn't. And that's probable cause to stop the car in search. No, the cause to stop the car was- The cause we know was the tail light. It was, it was, it was, it was- But I'm talking about why we're here today. It's not about the tail light. We're here because that stop and her circumstance of when she stopped is the basis for saying the only two, nervousness and didn't stop at the point where, as you're now urging us to say, 200 people always go there. That is the initial red flag that builds upon the circumstances. It's not a red flag if it is. It's, it's the first, it's the first step. It was his first red flag that built upon his reasonable suspicion that there was criminal activity afoot. Okay. What's the next one? The next one, Your Honor. Go ahead, Judge, any of you. I'm sorry. My recollection of the video was that this area you're describing is basically parallel to the woman's vehicle at the time the lights were activated. Is that accurate? My recollection of the video is, Your Honor, you can see the turning lane where she could have turned off and that wasn't what happened when the lights were activated. There was an opportunity for her to pull off and she chose not to. And so the officer's testimony is, I'm thinking either one, we're pulling off here for a variety of reasons. One, they're concealing something. Two, they're getting a story together and planning. Or three, for officer safety reasons. Answering Judge Agee's question doesn't show that she's nearly parallel to the place that's supposed to be the lighted place that people normally stop. Isn't that true? No, it's not true. So what video are you looking at? The area, and part of the problem is, is that the video obviously does not depict this area. There is testimony about this area. It's a parking area. It's a parking center. So Route 7 goes through this corridor and next to it, there are businesses and parking areas. That is the area that we're discussing here. So yes, she's saying on the main road where there is a big parking area from a business that is off this main road. The video obviously doesn't depict that. And I believe that Dr. Officer Helms was clear about describing that the video camera, as well as the body camera, whichever camera, did not fully depict the scene. Well, I don't know that there's any dispute that the area was there. The question was whether at the time the officer turned on his lights, there was sufficient time for her to get there as opposed to where she ended up. I believe from looking at the video that there was sufficient time to pull there, that she could have pulled off into that area. The next thing that occurred is when he approached her vehicle and she's clearly shaking. His testimony was... Clearly shaking? His testimony was... I'm not asking you. I'm not talking about... I don't have to rely on someone's testimony when I can see what happened. You said she's clearly shaking. Well, Your Honor, that's the problem is because his testimony was that the video did not capture... I was looking at the lady's face. Maybe I saw the wrong movie because the one I saw, she's right there talking to him from the beginning and you can see her talking to him. Officer, she's getting there. That was a different person. You got another video? Nope. Not a different person. Go ahead. I'm worried now. Go ahead. What his testimony was... That he always looks at the hands for safety reasons and because of firearms. And as he's watching her hands, her hands are visibly shaking. He further testified that that was not depicted on the video, but he had his flashlight and he clearly observed her shaking hand, which was shaking when she was reaching for the required material, driver's license, registration. And when she handed to him, it was shaking as well. It would be fundamentally... I saw her handing. She went there. She was explaining she had been to DMV. I think I saw when she handed that to him. Was it another document? Because he held it for a long time. It was almost blocking the light. He was looking at it for the longest time through the light. It was an interesting type vision of it. I saw it when she handed that to him. She handed it to him in his testimony. His unrefuted testimony, quite frankly, Your Honor, is that her hands were shaking. And understand that... Does the video show her handing it to him? And the testimony is... Sorry, I need to talk over you, Your Honor. But does the video show her handing the document to him? Yes, it does. Can I see? Is it right when I said I saw that? His testimony was that the video, which is not the best quality, does not accurately depict what he observed. It would be a profound mistake to conclude that if something is not observable on the video, that it did not happen. That was his testimony. There is no reason to conclude in any way that this officer testified falsely or was not honest about what he observed. Rather than saying that, the question is that I give that the fact that she says she was drumming along the side of the door. You can't see that. I'm not talking about that. But you now want to include that she was shaking. You can see she was visibly shaking when she gave him the document. That's what I'm talking about. That was his testimony in the record, Your Honor, that he observed her visibly shaking when she was retrieving the information and when she handed him the information. Sorry to interrupt you, but even if we accept that, and of course the problem is that the video might suggest otherwise, the question is whether or not the nervousness that he claims the officer testified to observing is beyond the norm that we would normally discount. That's the issue, and it just doesn't strike me as if she was nervous, she responded to the officer's questions perhaps a little bit too verbosely for his satisfaction, and she tapped on the window. So those three things, what is it about those three things that you say amount to the kind of nervousness that is probative to a question on a motion to suppress? So Officer Helms testified that her behavior was beyond what would be nervous in the normal traffic stop. Okay, go ahead, explain that. Why is that? Of course, he's conducted thousands of these types of behaviors, and he actually said that it is typical for people to be nervous in the traffic stop. Her nervousness exceeded what normally occurs in a traffic stop, and as a result... Did he explain why? What he did was, is that he employed an interdiction type technique where you tried to calm them down to see if it changes, and that was the reason why he quickly said to her to dispel her nervousness. I'm only going to issue you a citation if everything checks up. So he says this employing this technique, and it did not change. Subsequent... Okay, but he at that point didn't go back to his car, so how could he have observed no difference in her nervousness? Well, what he observed then was the nervous tapping on the door, which is an obvious exhibition of nervous behavior to the point that when the other officer showed up, he used it as a training technique and pointed out and said, do you see what she's doing here, that tapping on the door? That is a classic sign of nervous behavior. That was after he made the attempt to dispel her and to calm her down, and it did not work, which is the reason why... Assume that all that's accurate. She's nervous. Whether or not that nervousness is in excess of the norm when someone stopped is debatable. She could have physically pulled over into a better lighted area, but went a little bit farther. What makes those two items sufficient to merit reasonable suspicion as a matter of law? There are several things. First of all, one of the things that we can't do is discount Officer Helms' 14 plus years of experience, more than 2000 traffic stops where he is engaging with individuals in this situation. One of the things that he did was he clearly articulated why each thing that she did made him believe that this was not a normal traffic situation and that there was something else going on. You couple his experience and how diligently he wrapped up this whole situation, it was eight minutes. It was eight minutes from beginning to end. The canine is already in the car. The backup, as a matter of protocol, is coming to that location because that is what they always do. His experience, the indicators that he discussed, he calls it a slow roll. He knows what people typically do. That car did not do that. When he approaches the vehicle, the shaking hands, the nervous bantering about the DMV and her grandkids that was in no way responsive to the traffic stop, him telling her at this point in time to calm her down, that I will just issue a warning citation if everything is okay and it did not work, rather than a sigh of relief, she engages in more nervous indicators, which is the whole tapping on the door. Next. It had nothing to do with it. What does, where is she going, have to do with the stop? It had nothing to do with the stop. But the officer uses that, right? Is that a technique? That is a technique. Right. Isn't that a technique that normally involves people being more nervous? Because, first of all, you stop me. I'm going. I'm going in the direction of the highway. I'm going east on this highway I'm going. Where I'm going is really not your business. The question is, you're stopping me. I know police officers do that because you're right. But that hides your suspicion. First thing, where am I going? You stopped me. You asked me, where am I going? But people don't do that. So you get nervous because you say, it's more than just this. Because you're asking me about something that's really not your business. Because that's what America is. That's why our founders were just so, they were radical. They said, you just can't, that's why the Fourth Amendment is so powerful. This originalist should be joined in this case because they said, no, you can't do that. Why are you telling me? I don't have to tell you anything, sir. Here's my registration and here's my license and that. But you don't because you try to be cooperative as she was. And then you punish if you're trying to say, well, let me get to you. And I went to the DMV and I got those things. That's nervousness that seems to be, you're a criminal, you're doing something wrong. But she talked about her grandchildren. You said it as if that was like, who talks about their grandchildren? Well, I got some grandchildren. I might talk to them. You know, I'm going to pick them up, for example. I'm going to pick them up. Why are you stopping me? So one of the things that Officer Helm has that certainly most people don't have, in addition to his years of experience on the job, is training and education on detecting and deciphering these clues. And it would be a mistake to discount those things. There are classes on deceptive behavior. There are classes. I agree with you. Officers have a lot of experience and they should use that experience and they do it to help people. I'm not discounting at all. But the problem is this, you can do the same thing. There are some officers who, because of their experience, the way you answer the first question might put them on notice. You say, where are you going? It's your business where I'm going. Something like that. They answer like that. That might be a switch. But we couldn't, I don't think any court in America would say, it was probable cause to search them because the first response was, it is not your business where I'm going. Do you agree with that? Well, I do. Do you agree with that? No, I do agree with that, but that's not what happened here. I know it did, but you're saying intuition is important, but it is not sufficient. That's the question. Granted, officers might say, you know, something about this, I just think, I don't know. Because you're right, he was mumbling to somebody and they said, well, she's tapping, she's doing that. But that may arise your suspicion, but is that enough under the fourth amendment in our jurisprudence? That's the question. In and of itself, it would not be enough, but it's not in and of itself. There are substantial other things that are going on that he articulated. When he goes back and he approaches her, the first thing when he asked her, is there anything illegal in the car? Her comment was, not that I know of. And then she says. Well, that would be a good answer when you got two other people in the car, wouldn't it be? But most people do know what's in their car. You know what, I've had several people in my car, I've wanted to go through their pockets before they sat in the car. Do you? Yes, but remember, this is from. You ask anything in the car, which would include anything that anybody has, she answered as correctly as you can. So, not that I know of. In other words, I can't vouch for everything, but not that I know of. And you, how do you, what kind of counsel, you're urging us to say the constitutional sufficiency is there because she answered, not that I know of, that's suspicious. She should have said, no, right? Her next statement was, not that I'm aware of. Then she says. I'm sorry. Is any of that relevant? Because the district court actually find that relevant to its. Well, no, you're right. The district court did not get there. The district court found that there was reasonable suspicion and he was justified in the brief extension at that point. But you want us to find additional facts? I think that these facts are part of the record. Well, but had the purpose of the stop at that point been executed? Had he already given her the warning? He had not given her the warning. Quite frankly, when you look at the video, she was not giving that warning ticket into well into the traffic stop. She had, she had not received her warning citation at this point. Well, it came through. It didn't come out. You can see it roll out. He started it. And then when the officer came and he was instructing the officer about observing the nervous tap, then he went and he approached her, but he did not hand her that warning. So he prolonged it at that point then because he didn't just snatch out and give it to her. No, yes. He's, I'm not certain if he had finished it, if he had to go back and finish it, but certainly, yes, he started it. He stopped it. And then he went to speak with her. But she did not get that citation until later. But the point of that is, not only did she say, I don't know if there's anything illegal in the car. She then clarifies and says, I don't have anything illegal in the car. My daughter doesn't have anything illegal in the car. My boyfriend doesn't have anything illegal in the car, and I can't speak to anyone else. Yeah, but I think that all happened after the stop had been improperly extended. The whole stop before the canine was about eight minutes. And so the other question is whether or if it was extended beyond something unreasonable, where based upon what he had, if that wasn't enough for him to either dispel or confirm his suspicions that something was going on based upon his interaction with her. And eight minutes is not unreasonable. I understand that taking an isolation, each one of those things is not sufficient. But when you couple it all together from his reasonable perspective, he had reasonable suspicion. That's not the way most people stop. In and of itself, no, that's not enough. But that is the first thing that got his attention. Her excessive nervousness that he observed, yet again, I understand that the videotape did not reflect that. There's no reason to discount that, and there's no evidence contrary to that. At one point, he said to her, you were nervous, and she doesn't dispute it. That and after he employed that technique to calm her down, and she still is not calm. Those are reasonable suspicions, and it's sufficient for him to extend that stop for that canine, which is already on scene. The record shows that when he said, okay, she said, he says, your driver's license, okay, she said, that's fine. I'm going to check this out. If all this checks out, then I'm going to give you a warning thing. And he walked off. He walked off. He says that everything checks up, but it had not checked out at that point. But he walked off when he said that. He went, I'm going to go back to check it out. Yes. And as he said... But how did he, after that, before that, then confirm that it had not subsided, her nervousness? Her nervous tapping on the door, which is a... But he walked away when he said, I'm going to go check it out. Yes. The last thing he said was, I'm going to go check this out, and be on your way if everything checks out. He walked off. So he left. Yes, he left. Turned his back and went to the cruiser. Yes. And from his cruiser at his car, he's watching her, and he sees her utilizing the nervous tapping on the door. From his cruiser, he said, that's when he heard the tapping on the door? He saw it. And you can see it on the video. You can see her tapping, and you can see, and you can certainly hear him talking to the other officer, training him about, this is a nervous indicator. So yes, after he tried to dispel her... The inside of his car when he was talking. Yes. I'm sorry. He was in his car. He could see her tapping inside his car. She was tapping on the outside. I know, on the outside. Okay. Yes. She's tapping on the outside of the door. So he's in his car. Her hand is on the outside of the car door tapping. She's not... Her hand's on the inside. It's on the outside of the car. And it was observable. She's exposing her hand, which is really good for police, because that's one of the best things to do, I would think, to make sure the police officer know, because so many times I saw them moving inside. Her hand is outside. So she's being more, more, even more so, wasn't it? That's more than necessary, because you got your hand out there, it's dangling and tapping. I mean, that's the opposite of being... You're trying to cover up something. You got your hand out so it can be seen. Matter of fact, I think one of the safest things to do is, the way it is now, the problem is putting both hands outside of the door. So you can't say, I'm not doing anything, grabbing for something. So that's a part of the reason to stop it, because she had her hand dangling outside, so an officer could see it. That wasn't why she was doing it, though. She was dangling it because she's nervous and therefore... Okay. I see your argument now. I understand. Go ahead. I think your time is up, but do you want to finish your thought on that? Just the point that I was going to make, Your Honor, is there's no evidence in the record that she was tapping on the door for any reason other than potential nervousness, and not because she was somehow frightened or in fear of her life, and she felt the need to let the officer know that she wasn't a threat. A few points briefly, Your Honors. First, when the officer asks, this is at 12.01 on the body camera video, when it says, you seem nervous, I actually disagree that she doesn't dispute. I think she makes a less than clear statement, but I think if the court watches that at 12.01, she'll say, she makes a face like this and a noise. She goes, not really. She's not agreeing, I don't believe. Secondly, when she says, not that I know of, I just want to point out that both of those things occur after the stop had already been extended. The purpose of the stop was concluded, the district court found, at 11.59 when the citation was printed. You can hear that being printed off. It's printed. All that remains to be done is to hand it to the officer, and it's The officer doesn't actually hand it to her until 12.53, which is nearly an hour after he pulls this car over and rummages through it over and over again, expressing his disappointment that he hasn't found any drugs, because this is, of course, a drug investigation, and when you are a hammer, everything looks like a nail. That being said, Rodriguez tells us two things that are relevant here. First, not even de minimis delays are acceptable, which is what we have here. And second, officer safety concerns apply only to the actual stop itself and not to the unrelated extended bonus drug investigation that was being conducted. And lastly, I did not hear the government cite a single decision of this court upholding reasonable suspicion on such thin facts. It falls well short of any we've found, and apparently not that the district court could find either. Only the suggestion that if an officer simply testifies that in his experience, this is unusually nervous, that that can somehow trump this court's precedent. It cannot. It does not. And for all these reasons, we ask this court to vacate in reverse. Thank you. Thank you both, counsel, for your arguments. Love to come down and greet you. Yeah, we can't do that today, but know that we appreciate your arguments, and thank you so much for your representation today. Please be careful and be safe. We'll proceed to our last case.
judges: Roger L. Gregory, G. Steven Agee, Albert Diaz